## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A CRIMINAL COMPLAINT

I, Aaron Blanco, being sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Massachusetts State Police ("MSP") Trooper since October 2022. Since May 2023, I have been assigned as a Task Force Officer ("TFO") of the Drug Enforcement Administration ("DEA"). Since that time, I have been assigned to the Boston Homeland Security Task Force, which is a strike force incorporating various law enforcement agencies, including DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.

2. I am a graduate of the Municipal Police Training Committee Police Academy and the Massachusetts State Police Academy. Prior to becoming a Trooper, I was a Lawrence Police Officer from 2014 to 2022, where my duties included assignments to the Street Narcotics Unit (2016 to 2020) and the Merrimack Valley FBI Task Force (2020 to 2022). I am currently pursuing a Bachelor of Science degree in Criminal Justice from the University of Massachusetts, Lowell. I have attended numerous narcotics investigation courses, including a two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

3. During my time as a police officer and TFO, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws. A

number of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

## PURPOSE OF THE AFFIDAVIT

4.      I submit this affidavit in support of a criminal complaint charging that beginning at least on or about July 1, 2025 and continuing until the present, (1) Claudio SOTO PENA, a/k/a "Jayy", and (2) Wilfredo SIME SANTOS, did knowingly and intentionally conspire together and with others, known and unknown, to distribute and possess with intent to distribute 400 grams or more of a mixture of substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(vi) (the "Target Offense").

5.      The facts in this affidavit come from my personal observations and information obtained from other agents, investigators, and witnesses. My interpretations of conversations, conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. This affidavit is intended to show that there is probable cause for the requested

warrants and does not set forth all of my knowledge about this matter. All times herein are approximate.

## PROBABLE CAUSE

### Relevant Prior History

6.     On July 18, 2025, the Honorable M. Page Kelley, United States Magistrate Judge, District of Massachusetts, issued a warrant authorizing the installation of a tracking device on a gray Kia Optima (the "Target Kia") operated by SIME SANTOS.  *See* No. 25-MJ-6314-MPK.

7.     On September 29, 2025, the Honorable Jennifer C. Boal, United States Magistrate Judge, District of Massachusetts, issued a warrant authorizing the installation of a tracking device on a gray Toyota Camry (the "Target Camry") operated by SIME SANTOS.  *See* No. 25-MJ-7466-JCB.

### Background of Investigation

8.     Beginning in early July 2025, investigators from the DEA Boston Strike Force began investigating a drug trafficking organization ("DTO") based in Massachusetts that distributed fentanyl to other drug dealers operating in New England, including Maine.  In July 2025, investigators observed an apparent drug transaction that took place inside a gray Range Rover near South Station in Boston.  Investigators stopped the individual who left the gray Range Rover after the brief encounter inside the vehicle and recovered about 200 grams of fentanyl from that person.  Investigators obtained a phone number for the drug supplier who provided the fentanyl during that transaction, who was known as "Jayy."  Thereafter, an undercover officer contacted "Jayy" to purchase fentanyl from him.  Investigators subsequently identified "Jayy" as SOTO PENA based on a subsequent traffic stop of SOTO PENA in the white Range Rover and a voice identification, among other things.  Investigators further learned that SOTO PENA

3

utilized multiple phone numbers and phone-based messaging applications, such as Signal, to conduct his drug trafficking operations.

9. Through the UC's communications with SOTO PENA, investigators conducted multiple undercover fentanyl transactions from SOTO PENA's drug trafficking organization in July and August 2025.[1] The undercover fentanyl transactions ranged from 100 grams to 200 grams of fentanyl per transaction, and the total amount of fentanyl purchased from SOTO PENA and SIME SANTOS during this time period was over 700 grams based on subsequent lab analysis. Several of these transactions are detailed below. In sum, the UC communicated with SOTO PENA to arrange fentanyl transactions, and then SIME SANTOS met with the UC to complete the negotiated fentanyl transactions in hand-to-hand exchanges in Boston.

### July 10, 2025, Undercover Fentanyl Transaction

10. On July 10, 2025, the UC communicated with SOTO PENA to arrange a fentanyl transaction to occur that day at South Station in Boston. At about 11:30 a.m., investigators established surveillance in the area of South Station in Boston in anticipation of the planned fentanyl transaction. All of the UC's communications with SOTO PENA described in this affidavit were consensually recorded and preserved unless otherwise noted. At about 12:24 p.m., SOTO PENA contacted the UC and told the UC to go the CVS located at South Station. Then, investigators observed the Target Kia pulled-over on Atlantic Avenue in front of South Station, and at about 12:36 p.m., SOTO PENA instructed the UC to go to the Target Kia.

---

[1] SOTO PENA travelled from the United States to the Dominican Republic on about July 21, 2025, and did not return to the United States until September 11, 2025. SOTO PENA coordinated multiple undercover fentanyl transactions from the Dominican Republic.

4

11. At about 12:37 p.m., the UC entered the rear seat of the Target Kia. Inside the Target Kia, the operator of the Target Kia—subsequently identified based on his driver's license photo as SIME SANTOS—provided the UC with a clear plastic bag of suspected fentanyl, and the UC provided SIME SANTOS with $1,000, which was the predetermined price for 100 grams of fentanyl. At about 12:38 p.m., the UC exited the Target Kia, and the Target Kia departed the area. The UC's interactions inside the Target Kia were audio and video recorded.

12. The suspected fentanyl obtained from SOTO PENA and SIME SANTOS on July 10, 2025, was sent to a drug laboratory for analysis, which confirmed that the substance contained 101.1 grams of fentanyl.

### July 14, 2025, Undercover Fentanyl Transaction

13. On July 13, 2025, the UC communicated with SOTO PENA and arranged a meeting for the following day to purchase 200 grams of fentanyl from SOTO PENA for $2,000. All of the UC's communications with SOTO PENA referenced here were consensually recorded and preserved unless otherwise noted. They agreed to meet on July 14, 2025, at about 11:25 a.m. at the same location as the July 10, 2025, fentanyl transaction.

14. On July 14, 2025, in anticipation of the planned fentanyl transaction, investigators established surveillance in the areas of South Station and 25 Newton Street in Lawrence, Massachusetts, which is the address listed on SIME SANTOS's driver's license. At about 11:25 a.m., the UC contacted SOTO PENA and SOTO PENA told the UC to go to the same location as the July 10, 2025, transaction to wait. At about 11:38 a.m., investigators in Lawrence observed SIME SANTOS exit 25 Newton Street and enter the Target Kia, which was parked nearby on an adjacent street. SIME SANTOS was the driver and sole occupant of the Target Kia. Investigators followed the Target Kia as it travelled from there directly to South Station. At about 12:18 p.m.,

SOTO PENA messaged the UC that the Target Kia was five minutes away from the meeting location, and at about 12:22 p.m., investigators observed the Target Kia arrive at South Station on Atlantic Avenue.

15.     At about 12:24 p.m., the UC entered the rear seat of the Target Kia. Inside the Target Kia, the UC observed a small clear plastic bag containing multiple smaller plastic bags of a powdery substance on the floor of the rear passenger seat. The UC asked SIME SANTOS about the small clear bag on the floor, and SIME SANTOS directed the UC to a larger bag of a powdery substance that was in the rear armrest cupholder area. The UC retrieved both bags, and provided SIME SANTOS with $2,000, which was the predetermined price for 200 grams of fentanyl. At about 12:24 p.m., the UC exited the Target Kia, and the Target Kia departed the area. The UC's interactions inside the Target Vehicle were audio and video recorded.

16.     The suspected fentanyl obtained from SOTO PENA and SIME SANTOS on July 14, 2025, was sent to a drug laboratory for analysis, which confirmed that the substance contained 213.6 grams of fentanyl.

### August 5, 2025, Undercover Fentanyl Transaction

17.     On August 4, 2025, the UC communicated with SOTO PENA to arrange a drug transaction for the following day. All of the UC's communications with SOTO PENA referenced here were consensually recorded and preserved unless otherwise noted. The UC and SOTO PENA agreed for SOTO PENA to sell the UC 100 grams of fentanyl for $1,000, and they agreed to meet at the "same spot"—referring to the area of South Station in Boston, where the previous drug transactions took place.

18.     On August 5, 2025, in anticipation of the planned fentanyl transaction, investigators established surveillance in the area of 25 Newton Street in Lawrence,

Massachusetts. At about 11:25 a.m., investigators observed SIME SANTOS exit the residence at 25 Newton Street and enter the Target Camry, which was parked nearby on an adjacent street. SIME SANTOS was the driver and sole occupant of the Target Camry. Investigators observed the Target Camry travel southbound on Interstate 93 towards the planned meeting location in Boston, and then at about 12:07 p.m., investigators near South Station observed the Target Camry arrive at Atlantic Avenue near Essex Street in Boston. The Target Camry pulled in front of the CVS on Atlantic Avenue and parked—similar to prior undercover drug transactions.

19. At about 12:09 p.m., SOTO PENA called the UC and indicated that the Target Camry was at the meeting location. The UC asked SOTO PENA what car the UC was meeting. SOTO PENA first indicated that it was a "Toyota Carolla," but then the UC asked if it was a gray Toyota Camry—referring to the Target Camry parked on Atlantic Avenue at the meeting location—and SOTO PENA affirmed. The UC then approached the Target Camry and entered the front passenger seat. Inside the Target Camry, the UC met with SIME SANTOS, who was in the driver's seat. SIME SANTOS provided the UC with a clear plastic bag containing several smaller plastic bags of tan powdery substance, and the UC provided SIME SANTOS with $1,000 in cash. At about 12:10 p.m., the UC exited the Target Camry, and the Target Camry departed the area. The UC's interactions inside the Target Camry were audio and video recorded.

20. The suspected fentanyl obtained from SOTO PENA and SIME SANTOS on August 5, 2025, was sent to a drug laboratory for analysis, which confirmed that the substance contained 101.9 grams of fentanyl.

## CONCLUSION

21. I submit that there is probable cause to believe that beginning at least on or about July 1, 2025 and continuing until the present, (1) Claudio SOTO PENA, a/k/a "Jayy", and (2)

Wilfredo SIME SANTOS, did knowingly and intentionally conspire together and with others, known and unknown, to distribute and possess with intent to distribute 400 grams or more of a mixture of substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(vi) (the "Target Offense").

    I, Aaron Blanco, hereby state under penalty of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

/s/ Aaron Blanco

Aaron Blanco, Task Force Officer
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this ____ day of December 2025.   December 5, 2025

*Page Kelley*

Honorable M. Page Kelley
United States Magistrate Judge
District of Massachusetts